1
2
3
4
5
6 **IN THE UNITED STATES DISTRICT COURT**

7 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

8

9 TEAM ENTERPRISES, LLC.,                    CASE NO. CV F 08-0872 LJO SMS

10              Plaintiff,              **DECISION ON R.R. STREET'S SUMMARY**
                                        **JUDGMENT MOTION**
11     vs.                              (Doc. 299.)

12 WESTERN INVESTMENT REAL
   ESTATE TRUST, et. al,
13
               Defendants.
14 _____/

15 AND RELATED ACTIONS
16 _____/

17

18                          **INTRODUCTION**

19         Defendant R.R. Street & Co., Inc. ("Street") seeks summary judgment in the absence of

20 competent evidence to support plaintiff Team Enterprises, LLC's ("Team's") hazardous substances clean

21 up contribution claims based on federal and California environmental statutes and common law. Team

22 responds that factual issues preclude summary judgment for Street. This Court considered Street's

23 summary judgment motion on the record[1] without oral argument, pursuant to Local Rule 230(g). For

24 the reasons discussed below, this Court GRANTS Street summary judgment.

25 _____

26      [1]      This Court carefully reviewed and considered all arguments, points and authorities, declarations, testimony,
   statements of undisputed facts and responses thereto, and other papers filed by the parties. Omission of reference to an
27 argument, document, or paper is not to be construed to the effect that this Court did not consider the argument, document,
   objection or paper. This Court thoroughly reviewed, considered and applied the evidence it deemed admissible, material and
28 appropriate for summary judgment.

                                            1

# BACKGROUND

## Summary

Team is a New Mexico limited liability company. Since March 1980, Team has leased a portion of a Modesto shopping center ("property") where it has operated a One Hour Martinizing dry cleaner. During the 1980s, Team used at the property a Puritan Rescue 800 filter-and-still combination ("Puritan Rescue 800"), a Street product. Team characterizes the Puritan Rescue 800 as a filter to catch perchlorethylene ("PCE" or "perc"), a compound used in dry cleaning, for reuse in future dry cleaning cycles. PCE is a hazardous substance and was used on the property during 1980 to 2004.

## Street's Puritan Rescue 800

Street notes that Team's interrogatory responses "indicate just two links between Street and the Property":

1.  Street supplied Team the Puritan Rescue 800; and

2.  Street was the "exclusive agent for sale" of PCE manufactured by defendant Vulcan Materials Company ("Vulcan").

Street notes that the Puritan Rescue 800 "was a species of the two-stage 'filter-and-still' combination" to recycle dirty PCE for reuse. Street explains that a filter circulated dirty PCE through cartridge filters to return clean solvent to the dry cleaning system, rather than dispose it into the environment. In addition to filtration, dirty PCE was heated in a still's bottom until evaporated and rose to the top along with water so that soil and unevaporated PCE remained at the bottom. The evaporated PCE was partially separated from the water and reused in the dry cleaning system.[2]

---

[2]     Manfred Wentz ("Mr. Wentz") was Street's Corporate Vice President for Research and Development and Environmental Affairs. His September 5, 1991 memo ("Wentz memo") expressed his "views on the waste water disposal problem drycleaners face today." The Wentz memo explained:

> Drycleaning waste water is generated during drying of garments, distillation of dirty solvent, steam-sweeping of still residues, steam-stripping of spent cartridges and regeneration of carbon vapor recovery units.

> Because perc and water form an azeotropic boiling mixture, perc recovery efficiency is increased when water or steam is present during these operations. The perc and water vapors are condensed on a cooling coil and the liquified mixture is discharged into a water separator.

> There, the heavier perc will settle to the bottom and the water will float on the top of the separator. The

2

The Puritan Rescue 800's installation instructions provided in relevant part:

Using 3/4" pipe, pipe from waste water leg of water separator downward 18" so that waste water may be caught in a pail or other suitable container.  Then if the solvent side of the water separator becomes plugged and solvent backs up through the waste water outlet, solvent will not be lost down the drain.

In his deposition, Frederic Jones, Jr. ("Mr. F. Jones"), Team's vice-president of operations in Modesto, testified as to Team's use of the Puritan Rescue 800:

Q.    . . . was the Puritan filter still located there ever piped to a drain?

A.    I can't recall that it ever was piped directly to a drain.

Q.    But you remember it being piped to a bucket?

A.    Yes.

Q.    Now, would you tell us, sir, or confirm for us that the purpose of the bucket, one purpose of the bucket was to prevent pure perc going down the drain in the event of a separator malfunction?

A.    Yes.

Q.    . . . Did it ever work as intended, that is that it stopped pure perc from going down the drain?

A.    Normally, there was no problem with the separator working.  On the rare occasions it did not work, you could actually visibly see the perc in the bucket, so yes, it did work.

Q.    And so it did what it was supposed to do.  It kept pure perc from going down the drain in those instances, right?

A.    Yes.

**Waste Water Disposal In General**

Team contends that "the only disposal option available was to discharge waste water from the

recovered perc is returned to the solvent tank while the water is usually collected in a pail for appropriate disposal.  Because of its origin, this water is often called separator water.  Since it is discharged process water, it is more appropriate to call it waste water.

In the absence of impurities and enough residence time, a properly functioning separator will generate two clear liquid layers of water and perc. . . .

If a water seperator malfunctions or a still boils over, liquid perc, detergents and soils can be carried into the separator and mess it up.  Under these circumstances, droplets of perc can enter the waste water stream.  To avoid this, drycleaners collect the separator water in a pail and check for turbidity.  If the liquid remains turbid, it must be redistilled.

3

container into the sewer." Team points to deposition testimony of former Street Vice President Vincent

Romanco ("Mr. Romanco"):

> Q.   During the period of time when Street was instructing the dry cleaner operators to collect the separator wastewater in a bucket or other container, do you have an understanding based on your experience in the dry cleaning industry as to whether there was a general practice among dry cleaners as to how they actually disposed of the separator wastewater from the bucket or other container?
>
> A.   Through my experience, the general practice among a number of dry cleaners was to discharge it down the sewer.
>
> Q.   Would it be your recollection that that was the most likely way that dry cleaners would dispose of that separator wastewater collected in a bucket or container? . . .
>
> A.   Yes.
>
> Q.   . . . Is it your understanding that was the most common means for disposal of the separator wastewater?
>
> . . .
>
> THE WITNESS: There were no other options for them, so I would have to say yes.

To counter Team's contention of sewer discharge as the sole disposal option, Street notes Team's

use of evaporation and placement into hazardous waste drums removed by waste haulers, which Mr. F.

Jones acknowledged that Team employed to dispose of waste water. ("Q. . . . you discussed a policy

change that in 1984 you instructed all the Team stores to dispose of the PERC waste other than separator

water into waste drums.  A.  Yes."  "Q.  And why in about 1984 did you begin using hazardous waste

haulers to remove Puritan cartridge filters. . . . THE WITNESS: Just through industry knowledge, we

learned that it was not safe to put filters into landfills.")

In his declaration, Team officer Thomas Jones ("Mr. T. Jones") noted that during the 1980s,

"Street employees were in the Store [on the property] every 2-3 months to conduct sales calls and other

business." Mr. F. Jones testified that Street employees took titration samples from Team's dry cleaning

equipment in Team's Modesto stores.[3] Mr. F. Jones testified that after a titration test was completed,

"the remaining portion of the chemicals were [sic] disposed of in the easiest possible manner . . . it could

---

[3]      Defendants joining with Team to oppose Street's summary judgment motion note that titration testing checked clarity and condition of solvent after it passed through the Puritan Rescue 800's purification system.  Street responds that titration testing involved Team's "dry cleaning machine," not the Puritan Rescue 800.

1  either go back into the dry cleaning machine or down the floor drain."  Mr. F. Jones could not say "one

2  way or the other" whether such disposal occurred more than once because of the passage of time.  Mr.

3  F. Jones recalled seeing a Street employee pour a sample down the floor drain at a dry cleaner in

4  Modesto located on McHenry Street (not the property).[4]

5         Mr. F. Jones further testified:

6         Q.    On any occasion when an R.R. Street employee visited a Modesto dry cleaner
               that you were supervising, did they ever tell you that any of your practices needed
7              to be changed because of the possibility of contamination caused by
               perchlorethylene?

8              . . .

9         A.    No.[5]

10

11         As to directions to dispose of waste water, Street's Mr. Romanco testified:

12         Q.    Did Street ever give any directions to the dry clean operators prior to that point
               in '88 or '89 as to how they were to dispose of the water that was collected in a
13             bucket or other containers?

14         A.    No.

15         Along those lines, Mr. T. Jones declares:

16         Waste water is the liquid waste product which this equipment generates at the end of its
          cycle.  There were no known options until the mid to late 1980s as to disposal of such
17         waste other than down the sewer drain.  Team received no communication from Street
          throughout the 1980s that such a disposal practice was inappropriate.  The only

18

19         ───────────────────────

20         [4]       Street urges this Court to ignore evidence of Street employee visits and pouring a sample down a floor drain
          in that Team's responses to Street's interrogatories seeking facts to support Team's claims merely reference the Puritan
          Rescue 800 and instructions to dispose of waste water generated by expected use of the Puritan Rescue 800.  To support its
21         contentions against Street, Team's interrogatory responses stated that:

22              1.    "Street provided instructions as to the disposal of waste from the expected use of its product";

23              2.    The Puritan Rescue 800 "mandated disposal of waste from the expected use of its product.  Such waste was
                    required to go into the sewer";
24

25              3.    "Street's equipment had accidental releases due to sporadic malfunction of equipment, resulting in spills
                    of contaminants"; and

26              4.    "Street was the exclusive agent for sale" of Vulcan PCE to Team.

27

28         [5]       Team misguidedly claims that this testimony supports as an undisputed fact that "Street never instructed
          Team not to dispose of waste water containing PCE down the drain or into the sewer."

instruction provided by Street for disposal of waste water was to direct it into a bucket initially to ensure that the machinery was operating correctly – in other words, that the wastewater did not contain large amounts of Perc, which would indicate malfunction.

### The Wentz Memo

Team characterizes the September 5, 1991 Wentz memo to outline deficiencies in Street's instruction bulletins and manuals given that the Wentz memo suggests to "Prepare General Letter to inform our men about proper disposal of separator water." Team claims that manual and instructions for the Puritan Rescue 800 used at the property were not updated. Team appears to rely on the following from the Wentz memo: "It is not practical to revise the old Puritan instruction manuals. Therefore, we must prepare a sticker or label to be placed on the water separator of our equipment in the field."

Mr. Romanco testified that he could not recall if Street's manuals were revised as a result of the Wentz memo.

### Leaks And Spills

Mr. F. Jones testified that he witnessed leaks and spills from dry cleaning machines in his Modesto stores. Mr. F. Jones further noted that "[t]here are also boil-overs on the stills. Again, loose connections from the different pieces of equipment that may require hoses going – that would transport solvent from equipment to equipment." Team claims that with the spills, PCE fell to the concrete floor to require installation of sheet metal pans under dry cleaning equipment.

### Team's Claims Against Street

Team proceeds on its operative Third Amended Complaint ("TAC") to pursue hazardous substance clean up and remediation claims against numerous defendants, including property owners. The TAC alleges that Street:

1. "[M]anufactured, distributed, designed, assembled, maintained, controlled, operated, and/or repaired dry cleaning equipment, parts, replacement parts, and appurtenances, including, but not limited to, dry cleaning equipment specifically designed for the use, application, and disposal of PCE by TEAM";

2. "[D]istributed, transported, packaged, sold, disposed or and/or directed TEAM as to the use and disposal of" PCE;

3. Engaged "in service visits and inspections on the premises of the Property, including the

6

dry cleaning equipment products and testing and inspecting TEAM's dry cleaner equipment which included witnessing TEAM's disposal of PCE";

4.      "[E]xercised control over the disposal of PCE";

5.      "[D]irected that PCE be used in such a manner that the leakage of PCE necessarily and immediately resulted";

6.      "[F]ailed to warn, and/or failed to adequately warn, TEAM as to the dangers related to the use and disposal of PCE and/or the use [sic] the equipment provided by Street";

7.      "[I]s legally responsible for and committed each of the tortious and wrongful acts alleged herein"; and

8.      "[A]cted in the capacity of co-conspirator, aider, abettor, joint venturer, partner, agent, alter ego, principal, successor-in-interest, surviving corporation, fraudulent transferee, fraudulent transferor, controller, alter ego, licensee, licensor, patent holder and/or indemnitor of each of the remaining Defendants."

The TAC further alleges that the "Regional Water Quality Control Board, Central Valley Region ('RWQCB'), the State of California agency that oversees groundwater contamination issues, has indicated that the property requires clean up" and that Team "has incurred costs . . . due to contamination at the Property." The TAC alleges against Street claims under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601, et seq., and the Hazardous Substance Account Act ("HASA"), California Health & Safety Code, §§ 25300-25395.45. The TAC further alleges against Street claims for nuisance, trespass, equitable indemnity, and declaratory relief. The TAC seeks to recover Team's costs to respond to contamination at the property and a declaration that Street and the other defendants are jointly and severally liable for future costs. Team's claims against Street will be discussed in greater detail below.

## DISCUSSION

### Summary Judgment Standards

Street seeks summary judgment given the absence of a "genuine issue of material fact as to any claim asserted against Street" and Street's entitlement "to judgment as a matter of law on all of Team's claims." Team responds that it raises factual issues to bar summary judgment for Street.

7

1    F.R.Civ.P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on

2    all or part of the claim."  "A district court may dispose of a particular claim or defense by summary

3    judgment when one of the parties is entitled to judgment as a matter of law on that claim or defense."

4    *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st Cir. 1999).

5    Summary judgment is appropriate when there exists no genuine issue as to any material fact and

6    the moving party is entitled to judgment as a matter of law.  F.R.Civ.P. 56(c)(2); *Matsushita Elec. Indus.*

7    *v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific*

8    *Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The purpose of summary judgment is to

9    "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial."

10   *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin*

11   *Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

12   On summary judgment, a court must decide whether there is a "genuine issue as to any material

13   fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56(c)(2); *Covey*

14   *v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*,

15   398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82

16   S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir.

17   1984).  The evidence of the party opposing summary judgment is to be believed and all reasonable

18   inferences that may be drawn from the facts before the court must be drawn in favor of the opposing

19   party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S.

20   at 587, 106 S.Ct. 1348.  The inquiry is "whether the evidence presents a sufficient disagreement to

21   require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

22   *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

23   To carry its burden of production on summary judgment, a moving party "must either produce

24   evidence negating an essential element of the nonmoving party's claim or defense or show that the

25   nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of

26   persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th

27   Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir.

28   1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the

8

court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574.  "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598. "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d at 574.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make the showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")

"But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.  "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

As discussed below, Team fails to raise sufficient factual issues to defeat summary judgment for Street.

## **Responsible CERCLA Parties**

The TAC's (first) CERCLA cost recovery claim under 42 U.S.C. § 9607(a)[6] alleges that

---

[6]     Unless otherwise noted, all further statutory references with be to CERCLA, United States Code, Title 42.

9

defendants are "arrangers" of "disposal and release of hazardous substances into the soil, groundwater and environment," are "transporters of hazardous substances," and are liable for "necessary response costs" to address "the release of hazardous substances at or affecting the Property or surrounding properties."  The TAC's (second) CERCLA contribution claim under section 9613(f)(1) alleges that "if TEAM is found to be liable under CERCLA," Street and the other defendants "are liable to TEAM for their acts or omissions" to entitle Team to contribution.

CERCLA was enacted in 1980 to provide effective responses to health and environmental threats posed by hazardous waste sites. *United States v. Burlington Northern & Santa Fe Ry. Co.*, 502 F.3d 781, 792 (9th Cir. 2007), *reversed on other grounds*, __ U.S. __, 129 S.Ct. 1870 (2009).  Under CERCLA, federal and state governments may initiate cleanup of toxic areas and sue potentially responsible parties for reimbursement. *Burlington Northern*, 502 F.3d at 792.  A key CERCLA purpose is to shift "the cost of cleaning up environmental harm from the taxpayers to the parties who benefitted from the disposal of the wastes that caused the harm." *EPA v. Sequa Corp. (In the Matter of Bell Petroleum Servs., Inc.)*, 3 F.3d 889, 897 (5th Cir. 1993).  CERCLA is a "super-strict" liability statute. *Burlington Northern*, 502 F.3d at 792.  "[L]iability is joint and several when the harm is indivisible." *Burlington Northern*, 502 F.3d at 793.

Section 9607(a) "allows private parties who incur cleanup costs to recover those costs from 'various types of persons who contributed to the dumping of hazardous waste at a site.'" *Carson Harbor v. County of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006) (quoting *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th Cir. 1989)).

Section 9607(a) identifies the following as "covered persons" subject to CERCLA contribution claims:

> (1) the **owner and operator** of . . . a facility,
>
> (2) any person who at the time of disposal of any hazardous substance **owned or operated any facility** at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise **arranged for disposal or treatment**, or **arranged** with a transporter **for transport for disposal or treatment**, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility . . . owned or operated by another party or entity and containing such hazardous substances ["arrangers"], and

(4) any person who **accepts or accepted** any hazardous substances **for transport** to disposal or treatment facilities . . . or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance ["transporters"] . . .  (Bold added.)

Section 9613(f)(1) authorizes contribution claims:

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.

Team must establish that Street is "within one of four classes of persons subject to CERCLA's liability provisions." *California Dept. of Toxic Substances Control v. Payless Cleaners*, 368 F.Supp.2d 1069, 1076 (E.D. Cal. 2005).  Although section 9607 creates the right of contribution, the "machinery" of section 9613 "governs and regulates such actions, providing the details and explicit recognition that were missing" from section 9607.  *Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1302 (9th Cir. 1997), *cert. denied*, 524 U.S. 937, 118 S.Ct. 2340 (1998).  As such, if an entity is not a covered person under section 9607, that entity is not subject to section 9613 contribution liability because 9607 creates the section 9613 contribution right.  *See U.S. v. Atlantic Research Corp.*, 551 U.S. 128, 139, 127 S.Ct. 2331 (2007) (the right to contribution under section 9613(f)(1) "is contingent upon an inequitable distribution of common liability among liable parties").

Street notes that the TAC fails to "specify into which of [the four] classes Street allegedly falls" and identifies persons other than Street as property owners and operators of the dry cleaner.  As such, Street focuses attention to the arranger and transporter classes and argues that it is not liable under either class.  Team notes that it "asserts only arranger . . . liability against Street."

### CERCLA Arranger Liability

"[D]etermination whether an entity is an arranger requires a fact-intensive inquiry that looks beyond the parties' characterization of the transaction as a 'disposal' or a 'sale' and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions." *Burlington Northern and Santa Fe Railway Co. v. United States*, __ U.S. __, 129 S.Ct. 1879, 1879 (2009).  "The Court must consider the totality of the circumstances . . . to determine

11

whether the facts fit within CERCLA's remedial scheme. . . . [T]here must be a 'nexus' that allows one to be an arranger." *Coeur D'Alene Tribe v. Asarco, Inc.*, 280 F.Supp.2d 1094, 1131 (D. Idaho 2003) (internal citations omitted).

Street attributes Team to proffer "two alleged facts" to support Street's arranger liability:

1.  "Street provided instructions as to disposal of waste from the expected use of its product"; and

2.  The Puritan Rescue 800 "mandated disposal of waste from the expected use of its product.  Such waste was required to go into the sewer."

Street contends the "alleged facts are false" in that the Puritan Rescue 800 installation instructions "enjoined" arrangement of the still's piping "so that waste water may be caught in a pail or other suitable container."  Street continues that under the recommended piping arrangement, PCE "will not be lost down the drain" in event of malfunction.  Street attributes Team to have followed Street's instructions in that Team vice president of Modesto operations Mr. F. Jones testified that Puritan equipment was "piped to a bucket" and that he could not "recall that it ever was piped directly to a drain."  Street notes Mr. F. Jones' acknowledgment that "one purpose of the bucket was to prevent pure [PCE] going down the drain in the event of a separator malfunction" and that this arrangement "did what it was supposed to do," that is, "kept pure [PCE] from going down the drain in those instances."

Team responds that Street qualifies as an arranger by its "intentional steps" to plan for and control disposal of PCE.  As such, Team concludes that Street arranged for disposal of hazardous substances owned by Team at the property.  Defendants joining Team's opposition contend that Street is an arranger in that Street "designed, manufactured and sold" the Puritan Rescue 800, "instructed operators to dispose of the filter's wastes down the floor drain or sink, and by virtue of Street's affirmative conduct in disposing of PCE down the sinks and floor drain" at the property.

### *Intentional Disposal*

Team notes that the U.S. Supreme Court requires "intentional steps to dispose" to impose arranger liability.  Street contends "there is no competent evidence that Street exercised 'control over the disposal process' at Team's store."

Since CERCLA "does not specifically define what it means to 'arrang[e] for' disposal of

hazardous substance" the U.S. Supreme Court gives "the phrase its ordinary meaning." *Burlington Northern*, __ U.S. __, 129 S.Ct. at 1879. "In common parlance, the word 'arrange' implies action directed to a specific purpose." *Burlington Northern*, __ U.S. __, 129 S.Ct. at 1879 ("to make preparations for" and "plan"). "[U]nder the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Burlington Northern*, __ U.S. __, 129 S.Ct. 1870, 1879. In *Burlington Northern*, __ U.S. __, 129 S.Ct. 1870, the U.S. Supreme Court held that pesticide manufacturer Shell Oil Company was not an arranger despite its knowledge of pesticide spills during transfers and deliveries, and due to equipment failures. The U.S. Supreme Court explained:

> While it is true that in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, **knowledge alone is insufficient to prove that an entity "planned for" the disposal**, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product. In order to qualify as an arranger, Shell must have entered into the sale of [its product] **with the intention** that at least a portion of the product be disposed of during the transfer process by one or more of the methods described in § 6903(3).

> . . . Shell's **mere knowledge** that spills and leaks continued to occur is insufficient grounds for concluding that Shell 'arranged for' the disposal of [a hazardous substance] with the meaning of § 9607(a)(3).

*Burlington Northern*, __ U.S. __, 129 S.Ct. at 1880 (Bold added).

<u>Planning For Disposal</u>

Team notes that "[a]cts of planning or preparing for disposal constitute an intentional disposal, and thus a proper arrangement" to impose arranger liability. Team contends that Street planned for disposal of PCE in that Street "decided" and "instructed Team to direct waste water to a pail or other suitable container," and "tracked, monitored and adjusted its equipment's disposal system" by employee visits. Team argues that determination "whether Street's acts constituted mere knowledge or intent present a factual inquiry appropriate for the trier of fact."

Street responds that planning for disposal is negated by absence of evidence that Street "installed or directed the installation of dry cleaning equipment, connected dry cleaning equipment for disposal, directed on-site disposal from dry cleaning equipment, or inspected dry cleaning equipment and its disposal." Street points to Mr. F. Jones' testimony that the Puritan Rescue 800's purpose was to recover

solvent for reuse, not to dispose of it.  Street further notes the Puritan Rescue 800's "detailed instructions intended to reduce the likelihood of operational spills of PCE waste."

Control Of Disposal

Team argues that Street controlled disposal of PCE in that:

1.    Street instructed that waste water should flow to a pail;

2.    Street Vice President Mr. Romanco admitted that the only option was to dump contents of a pail down the drain;

3.    Street employees "never said anything about improper method of disposal . . . to infer that Street's presence at the store evidenced some degree of control over its equipment";

4.    Street's employee "physically deposited a perc titration test sample, drawn from Street's machines, down the drain at Team's store" to infer that Street told Team such "activity was acceptable;

5.    "Street knew for years that waste water from its machines contained perc, and that dry cleaners . . . were disposing of it down the sewer"; and

6.    "Street's disposal method in the 1980s left Team with no alternative but to deposit PCE contaminated waste water into the sewer."

Street characterizes these "circumstances" as "the same hodgepodge of alleged conduct (sales calls, corporate documents, etc.) that we have shown to be improperly presented and irrelevant."  Street notes that Team "made the decisions that caused waste water to end up in the sewer."

In short, the record reflects that Street had no more than knowledge that the Puritan Rescue 800 might leak, spill, dump or otherwise discard waste water with PCE residue.  Based on its installation instructions, the Puritan Rescue 800 provided for waste water to be caught in a pail.  Once caught in the pail, Street had neither planned for nor controlled disposal of the waste water.  The record lacks Street's affirmative directive to pour waste water down a sewer drain, especially given that the record suggests that limited waste water was caught in a pail and Team had other disposal options.  Team Vice President Mr. F. Jones noted "rare occasions" to require waste water with visible PCE going to a pail and his lack of recollection that waste water was piped directly to a drain.  Mr. F. Jones admitted that the Puritan Rescue 800 performed properly to prevent pure PCE going down the drain.

1   Team offers little material evidence directed to operation of the Puritan Rescue 800 at the

2   property.  Team points to Street Vice President Mr. Romanco's comments on general dry cleaner

3   practice.  Team offers no evidence to connect such practice specifically to the property.  Team relies on

4   infrequent presence of Street employees in Team's Modesto stores, not exclusive to the property.  Mr.

5   F. Jones recalls seeing only once a Street employee pour a titration test sample down a floor drain at a

6   store located not on the property.  Team fails to connect the titration test sample to the Puritan Rescue

7   800 in that the record reflects that the sample addressed a dry cleaner as compared to the Puritan Rescue

8   800. Mr. F. Jones testimony that Street employees did not tell Team to change its practices suggests that

9   Street was not interested in planning for or controlling PCE disposal.

10   Street's knowledge of the activities noted above is not intentional steps to dispose of PCE.

11   ***Useful Product Defense***

12   Street contends that "the only fact connecting Street to the alleged disposal of waste is that Street

13   merely sold Team a filter-and-still combination that generated waste into a bucket; if that waste was later

14   disposed of into the environment, it was not by Street or pursuant to Street's instructions."  As such,

15   Street concludes that the useful product defense shields it from arranger liability.

16   Team responds that a "product that immediately and necessarily generates hazardous waste does

17   not qualify as a useful product."  Team notes that the Puritan Rescue 800 "disposed of a hazardous

18   substance each time a cycle was completed and waste water emitted" to prevent application of the useful

19   product defense.  Defendants joining Team's opposition to summary judgment contend that the useful

20   product defense is inapplicable when "parties to a transaction know that it is an absolute certainty that

21   the equipment will immediately and inherently generate hazardous waste which must be disposed."

22   "A person may be held liable as an 'arranger' under § 9607(a)(3) only if the material in question

23   constitutes 'waste' rather that a 'useful product.'" *Cal. Dept. of Toxic Substances v. Alco Pacific, Inc.*,

24   508 F.3d 930, 934 (9th Cir. 2007).  The useful product defense "applies when the sale is of a new

25   product, manufactured specifically for the purpose of sale, or of a product that remains useful for its

26   normal purpose in its existing state." *California v. Summer Del Caribe, Inc.*, 821 F.Supp. 574, 581

27   (N.D. Cal. 1993).

28   "The vendor of a useful product which through its normal course produces a hazardous

15

substance, such as a battery, is not an arranger under CERCLA." *Payless Cleaners*, 368 F.Supp.2d at 1077 (citing *Cadillac Fairview/Cal., Inc. v. United States*, 41 F.3d 562, 566 (9th Cir.1994)). A manufacturer of PCE cannot be held liable "as a CERCLA arranger where it has done nothing more than sell a useful chemical." *Payless Cleaners*, 368 F.Supp.2d at 1077. "[T]he manufacturer of dry cleaning equipment who does nothing more than provide the machines and operating instructions is not an 'arranger' of waste disposal under CERCLA." *Adobe Lumber v. Hellman*, 415 F.Supp.2d 1070, 1081 (E.D. Cal. 2006), *vacated on other grounds sub nom. Kotrous v. Goss-Jewett Co.*, 523 F.3d 924, 934 (9ᵗʰ Cir. 2008).

In the CERCLA context, "hazardous substances are generally dealt with at the point when they are about to, or have become, wastes." *3550 Stevens Creek Assocs. v. Barclays Bank of Cal.*, 915 F.2d 1355, 1362 (9ᵗʰ Cir. 1990). Congress did not intend CERCLA to target legitimate manufacturers or sellers of useful products but rather desired "to hold liable those who would attempt to dispose of hazardous wastes or substances under various deceptive guises in order to escape liability for their disposal." *Dayton Independent School Dist. v. U.S. Mineral Prods. Co.*, 906 F.2d 1059, 1065-1066 (5ᵗʰ Cir. 1990).

Acknowledging its "expansive view of arranger liability," the Ninth Circuit has "refused to hold manufacturers liable as arrangers for selling a useful product containing or generating hazardous substances that *later* were disposed of." *Burlington Northern*, 502 F.3d at 808 (italics in original). "Useful product" cases recognize that "liability cannot extend so far as to include *all* manufacturers of hazardous substances, on the theory that there will have to be disposal of the substance some time down the line, *after* it is used as intended." *Burlington Northern*, 502 F.3d at 808 (italics in original).

Street correctly characterizes its Puritan Rescue 800 as a useful product in that it was a "principal product" which did not immediately result in PCE waste disposal and was not a waste byproduct of the process of manufacturing a separate product. Courts distinguish between a sale of a used product for its disposal and a product sale as a main profit- making venture. *Cal. Dept. of Toxic Substances Control v. Alco Pacific, Inc.*, 508 F.3d 930, 938-939 (9ᵗʰ Cir. 2007) (citing *RSR Corp. v. Avanti Dev., Inc.*, 68 F.Supp.2d 1037 (S.D. Ind. 1999). The record reveals that the Puritan Rescue 800 sale was not "intended as arrangement[] for the disposal or treatment of a hazardous substance." *Alco Pacific*, 508 F.3d at 939

16

("the useful product doctrine would not apply if the true nature of the transactions . . . was an arrangement for treatment of contaminated styrene").  The record raises no factual issue whether the Puritan Rescue 800 is a hazardous substance and in turn, that its sale is an arrangement to dispose of hazardous substances.  Street merely sold the Puritan Rescue 800 which generated waste water PCE later disposed of by Team.  No PCE waste water was sold or transferred for disposal at the time of the sale of the Puritan Rescue 800.

Even looking beyond the actual sale, the record offers nothing to suggest that "disposal of a hazardous substance was arranged through the transaction."  *Payless*, 368 F.Supp.2d at 1077.  The analysis of a fellow judge of this Court rings true here: "Peters [parties seeking to impose CERCLA arranger liability] do not allege any facts to support a finding that a substantial part of Maytag's sale of the dry cleaning machines involved the arrangement for the disposal of waste water. Rather, Maytag's transaction can be described only as the sale of a useful good which, through its normal use, created a waste byproduct. Under these facts alone, Maytag may not be held liable as a CERCLA arranger."  *Payless*, 368 F.Supp.2d at 1078.

In sum, Street sold a useful product which through its normal use produced PCE-containing water waste.  As a manufacturer of the Puritan Rescue 800, Street merely provided equipment and operating instruction such that it is not an arranger subject to CERCLA liability.  Team and its joining defendants offer nothing to negate the useful product defense.

**CERCLA Transporter Liability**

Street argues that it is not subject to CERCLA transporter liability based on the useful product defense and the absence of evidence of elements for transporter liability.  Team appears to concede that Street is not a CERCLA transporter.

As to the useful product defense, Street notes that sections 9607(a)(3) ("arranger") and 9607(a)(4) ("transporter") share terms "disposal or treatment."  Street contends that if a person does not "arrange[] for disposal or treatment" of hazardous substances when he arranges for the sale of a useful product, that person does not "transport [hazardous substances] to disposal or treatment facilities" when he transports a useful product.  Street points to following from *Alco Pacific*, 508 F.3d at 934:

We have held that these definitions necessarily implicate the concept of "waste,"

17

1   and have developed a body of case law distinguishing between the disposal or treatment
2   of "waste" and the sale of a "useful product." . . . A person may be held liable as an
    "arranger" under § 9607(a)(3) only if the material in question constitutes "waste" rather
3   than a "useful product." . . . Application of this distinction has been referred to as the
    "useful product doctrine."  (Citations omitted.)

4   On this point, Street concludes that it cannot be a transporter given that PCE, as a matter of law, is a

5   useful chemical.  "Neither can a manufacturer of PCE be held liable as a CERCLA arranger where it has

6   done nothing more than sell a useful chemical."  *Payless Cleaners*, 368 F.Supp.2d at 1077.

7          Alternatively, Street contends that it is not a transporter in absence of facts to support "two

8   required elements" – transport/delivery of hazardous substances and selection of disposal facility.

9          To establish a prima facie case of CERCLA transporter liability, "a plaintiff must first have made

10  a showing that a defendant transporter actually brought hazardous substances to the site, whether

11  knowingly or not."  *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 604 (2nd Cir. 1999).  In addition, "a

12  person is liable as a transporter not only if it ultimately selects the disposal facility, but also when it

13  actively participates in the disposal decision to the extent of having had substantial input into which

14  facility was ultimately chosen."  *Tippins Inc. v. USX Corp.*, 37 F.3d 87, 94 (3rd Cir. 1994).  A

15  "transporter must be so involved in the selection process that it has substantial input into the disposal

16  decision."  *Tippins*, 37 F.3d at 95.

17         In sum, "[l]iability as a 'transporter' is established by showing that a person accepted hazardous

18  substances for transport and either selected the disposal facility or had substantial input into deciding

19  where the hazardous substance should be disposed."  *U.S. v. USX Corp.*, 68 F.3d 811, 820 (3rd Cir.

20  1995).

21         Street argues that Team fails to satisfy necessary elements given its limited evidence that "Street

22  was the exclusive agent for sale" of Vulcan PCE to Team.  Street contends that such claim fails to

23  establish that Street "accepted PCE for transport to the Property, let alone actually brought PCE there"

24  or "in any way 'selected' the Property to receive PCE."  To demonstrate the absence of its involvement

25  in transportation of Vulcan PCE, Street points to the deposition testimony of Street President David

26  Dawson ("Mr. Dawson"):[7]

27

28      [7]      Street notes that Mr. Dawson "managed Street's distribution of Vulcan PCE."

18

1   Distributors would place orders for perchlorethylene inventory with Street. Street
2   would communicate that order to Vulcan.  Vulcan would arrange for shipment of the
    bulk quantity of perchloretheylene in a tank truck, for example, to the distributor's
3   location.  The distributor would then fill his customers' orders from his inventory.

4   Street notes that the distributor "actually" brought PCE from its inventory to the delivery point.

5   Street further challenges that it selected the property to receive PCE in that a customer, such as

6   Team, decided "whether and where it will receive the product."  Street notes that to the extent it supplied

7   PCE to the property, "Street was necessarily following Team's directions."  "A transporter clearly does

8   not select the disposal site merely by following the directions of the party with which it contracts."  *U.S.*

9   *v. Davis*, 261 F.3d 1, 56 (1st Cir. 2001) (quoting *Tippens*, 37 F.3d at 95).

10   The record reveals no facts to suggest that Street is a CERCLA transporter.  Given Team's

11   acknowledgment that its asserts only an arranger claim, Street is entitled to summary judgment on

12   Team's CERCLA claims in that Team is not a covered person under section 9607(a).

13   **HSAA**

14   The TAC's (third) claim seeks indemnification and contribution in that Street and other

15   defendants "are liable persons under HSAA due to their status as . . . arrangers of the disposal and

16   discharge of hazardous substances on account of said Defendants' actual and direct control of the

17   method of disposal of PCE on the Property."

18   Street is not subject to HSAA liability in the absence of derivative CERCLA liability in that  a

19   "[r]esponsible party'" or "liable person" for HSAA purposes means "those persons described" in

20   CERCLA section 9607(a).  Cal. Heath & Saf. Code, § 25323.5(a)(1).  California Heath & Safety Code

21   section 25363(e), which permits indemnity and contribution claims for removal and remedial costs,

22   "parallels CERCLA."  *Western Properties Service Corp. v. Shell Oil Co.*, 358 F.3d 678, 682 (9th Cir.

23   2004); *see Castaic Lake Water Agency v. Whittaker Corp.*, 272 F.Supp.2d 1053, 1084 (C.D. Cal.2003)

24   ("HSAA 'create[s] a scheme that is identical to CERCLA with respect to who is liable.'").  The absence

25   of a valid CERCLA claim dooms Team's HSAA claim.

26   **Continuing Private Nuisance**

27   The TAC's (sixth) continuing private nuisance claim alleges that "[d]efendants" caused or

28   permitted contamination to constitute a nuisance pursuant to California Civil Code section 3479.

19

Team's interrogatory responses as to how Street "caused or permitted" contamination state:

1.    "Street provided instructions as to the disposal of waste from the expected use of its product";

2.    "Street's equipment, the Puritan Rescue 800, mandated disposal of waste from the expected use of its product.  Such waste was required to go into the sewer"; and

3.    "Street's equipment had accidental releases due to sporadic malfunction of the equipment resulting in spills of contaminants."

Team contends that it had "no alternative but to dispose of PCE-contaminated wastewater into the sewer."

California Civil Code section 3479 addresses "acts constituting nuisance" and provides:

Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or is an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance.

Street points to *City of Modesto Redevelopment Agency v. Superior Court*, 119 Cal.App.4th 28, 13 Cal.Rptr.3d 865 (2004), where the California Court of Appeal addressed a California hazardous substances remediation and recovery statute.  The California Court Appeal noted that in construing the statute "in light of the common law principles" on nuisance, "we conclude that those who took affirmative steps directed toward the improper discharge of solvent wastes – for instance, by manufacturing a system designed to dispose of wastes improperly or by instructing users of its products to dispose of wastes improperly – may be liable under that statute, but those who merely placed solvents in the stream of commerce without warning adequately of the dangers of improper disposal are not liable."  *City of Modesto*, 119 Cal.App.4th at 43, 13 Cal.Rptr.3d 865.

Street holds Team to show "affirmative steps or instructions" to establish nuisance by a distributor of PCE or related equipment.  Street argues that Team is unable to make such showing in that "Street merely placed its Puritan Rescue 800 in the stream of commerce but most assuredly did not instruct users of such equipment to dispose of wastes improperly," the "only basis for instruction-based nuisance liability" under *City of Modesto*.  Street notes that the Puritan Rescue 800's instructions directed

20

that waste water to be caught in a bucket "rather than to a drain or otherwise into the sewer or other pathway to the soil or groundwater."   Street points to Team Vice President   Mr. F. Jones' acknowledgment that the arrangement prevented PCE going down the drain.

Street continues that a claim of sporadic failures to result in accidental PCE releases does not approximate "affirmative acts" to the degree of "manufacturing a system designed to dispose of wastes improperly."  Street notes that sporadic failures do not equate to an affirmative act to tell "dry cleaners to set up their equipment to discharge solvent-containing wastewater into the drains and sewers." *See City of Modesto,* 119 Cal.App.4th at 41, 13 Cal.Rptr.3d 865.  Street points to the absence of evidence to tie equipment malfunction to the Puritan Rescue 800 or the property.  Street further notes that claims of failure to warn and sporadic, accidental equipment malfunctions sound in products liability, not nuisance. *See City of Modesto,* 119 Cal.App.4th at 39, 42, 13 Cal.Rptr.3d 865 ("law of nuisance is not intended to serve as a surrogate for ordinary products liability" and "failure to warn was not an activity directly connected with the disposal of solvents" and "does not fall within the context of nuisance, but is better analyzed through the law of negligence or products liability").

Team responds that the Puritan Rescue 800's instructions directed waste water to a bucket to constitute "an instruction to dispose of PCE into the soil and groundwater because there was no alternative but to dispose down the sewer."  Street points to the Puritan Rescue 800's design to render "spills unavoidable." Team concludes that the facts infer that Street took "affirmative steps" to dispose.

Team fails to challenge meaningfully Street's points as to the absence of a private nuisance claim against Street.  Team attempts to ground the claim on broad conclusions, not supportable evidence.  The record lacks facts of Street's necessary affirmative acts to subject it to private nuisance liability.  Team offers no facts to support its allegations or the elements of a private nuisance claim as to Street.  In addition, Team offers no facts that Street obstructed or interfered with the free use or enjoyment of the property to doom the private nuisance claim.

## Public Nuisance

The TAC's (seventh) public nuisance claim alleges that "contamination on and about the Property constitutes a public nuisance within the meaning of California Water Code Section 13050(m), and California Civil Code Sections 3479 and 3480."  The TAC's (eighth) public nuisance per se claim

alleges that "defendants'" conduct constitutes a public nuisance and violates California Water Code sections 13050(m), 13304, 13350 and 13387, and California Health & Safety Code sections 5411, 5411.5 and 117555.

Street argues that the public nuisance claims fail with Team's inability to "satisfy the requisites of that law."

Team offers no arguments specific to the public nuisance claims and appears to rely on its points discussed above.

California Civil Code section 3480 defines public nuisance as "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

California Water Code section 13050(m) defines nuisance as "anything which meets all of the following requirements":

> (1) Is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property.
>
> (2) Affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal.
>
> (3) Occurs during, or as a result of, the treatment or disposal of wastes.

"The concept of a nuisance per se arises when a legislative body with appropriate jurisdiction, in the exercise of the police power, expressly declares a particular object or substance, activity, or circumstance, to be a nuisance." *Beck Development Co. v. Southern Pacific Transportation Co.*, 44 Cal.App.4th 1160, 1207, 52 Cal.Rptr.2d 518 (1996). "[T]o be considered a nuisance per se the object, substance, activity or circumstance at issue must be expressly declared to be a nuisance by its very existence by some applicable law." *Beck Development*, 44 Cal.App.4th at 1207, 52 Cal.Rptr.2d 518. As noted above, the TAC specifies the applicable law as California Water Code sections 13050(m), 13304, 13350 and 13387, and California Health & Safety Code sections 5411, 5411.5 and 117555.

Street notes that *City of Modesto* considered California Water Code sections 13050(m), 13304 and 13050 to formulate the standard of care for manufacturers and distributors of PCE and related equipment. Street contends that since it does not breach such standard, Team is unable to establish

1    nuisance per se pursuant to the three California Water Code provisions.

2        Turning to the other statutes, Street notes that California Water Code section 13387 is a criminal

3    statute and imposes penalties for six types of prohibited acts.  Street points to Team's failure "to specify

4    which of these prohibitions Street supposedly violated."   Street continues that since California Water

5    Code section 13387 is part of the same statutory scheme construed in *City of Modesto*, "there is no

6    reason to think that California courts would not follow that opinion and impose the same 'affirmative

7    steps' requirement for holding manufacturers and distributors liable."

8        California Health & Safety Code section 5411 provides: "No person shall **discharge** sewage or

9    other waste, or the effluent of treated sewage or other waste, in any manner which will result in

10   contamination, pollution or a nuisance."  (Bold added.)  Street notes the absence of allegations or

11   evidence that Street discharged anything to conclude that Team lacks a claim under a statute that

12   "imposes liability only on one who has itself actually discharged the waste."

13       California Health & Safety Code section 5411.5 addresses "caus[ing] or permit[ting] any sewage

14   or other waste, or the effluent of treated sewage or other waste to be discharged in or on any waters of

15   the state."  Street argues that this statute is "essentially the same as the statute construed in *City of*

16   *Modesto*, under which Street has no liability."

17       California Health & Safety Code section 117555 imposes criminal liability on a person who

18   "places, deposits, or dumps, or who causes to be placed, deposited, or dumped, or who causes or allows

19   to overflow, sewage, sludge, cesspool or septic tank effluent, accumulation of human excreta, or solid

20   waste, in or upon" certain public places.  Street notes this statute's similarity to the others and the

21   absence of allegations or evidence that Street placed, deposited, or dumped anything.  Street continues

22   that it did not cause or allow the same "merely by placing a product in the stream of commerce."

23       Similar to the private nuisance claim, Team fails to challenge meaningfully Street's points as to

24   the absence of public nuisance and public nuisance per se claims against it.  Team appears to base the

25   claims on broad conclusions, not evidence, that Street and other defendants engaged in conduct to result

26   in "contamination of soil and groundwater on and about the Property, and surrounding properties" to

27   constitute public nuisance.  The record lacks facts of Street's acts subject to the California Water and

28   Health & Safety Code sections to subject it to public nuisance liability. Team offers no facts to support

23

1   such allegations or elements of a public nuisance claim as to Team.  In addition, Team offers no facts

2   that Street's conduct affected "an entire community or neighborhood" or obstructed or interfered with

3   the free use or enjoyment of the property to doom the public nuisance claims.

4                                                    **Trespass**

5          The TAC's (ninth) continuing trespass claim alleges: "Defendants have trespassed and are

6   trespassing on the Property by contaminating the soil and groundwater and/or by contributing to said

7   contamination."

8          Street contends that it is not liable for trespass for essentially the same reasons it is not liable for

9   nuisance.  Street explains that if "Team fails to make out a claim for nuisance, . . . Team fails to make

10  out a claim for trespass."

11         Team continues its argument that "Street created a disposal method where the only available

12  option was to dispose of PCE contamination waste water into the sewer."

13         "California's definition of trespass is considerably narrower than its definition of nuisance."

14  *Capogeannis v. Superior Court*, 12 Cal.App.4th 668, 674,15 Cal.Rptr.2d 796 (1993).  "A trespass is an

15  invasion of the interest in the exclusive possession of land, as by entry upon it."  *Wilson v. Interlake Steel*

16  *Co.,* 32 Cal.3d 229, 233, 185 Cal.Rptr. 280 (1982) (citation omitted).  "The essence of the cause of

17  action for trespass is an 'unauthorized entry' onto the land of another."  *Cassinos v. Union Oil Co.,* 14

18  Cal.App.4th 1770, 1778, 18 Cal.Rptr.2d 574 (1993) (citation omitted) (trespass occurred when

19  wastewater was injected from defendant's property to plaintiff's, interfering with plaintiff's mineral

20  estate).  A trespass "may include wrongful entry or invasion by pollutants."  *Martin Marietta Corp. v.*

21  *Insurance Co. of North America*, 40 Cal.App.4th 1113, 1132, 47 Cal.Rptr.2d 670 (1995).

22         Relying on Judicial Council of California Civil Jury Instruction ("CACI") No. 2000, Street holds

23  Team to establish that Street "intentionally, recklessly, or negligently caused" PCE to enter the property.

24  Street further holds Team to establish that Street's conduct was a "substantial factor" in causing harm.

25  Referencing *City of Modesto*, Street notes that a defendant in its position causes a discharge of PCE

26  waste only if it "took affirmative steps directed toward the improper discharge of solvent wastes."  *City*

27  *of Modesto*, 119 Cal.App.4th at 43, 13 Cal.Rptr.3d 865.  Street argues that Team's reliance on placing

28  the Puritan Rescue 800 in the stream of commerce does not constitute requisite affirmative steps.

                                                        24

1       Street also challenges the lack of consent element of trespass.  When a "owner of property

2  voluntarily places a product on the property and the product turns out to be hazardous, the owner cannot

3  prosecute a trespass cause of action against the manufacturer of that product because the owner has

4  consented to the entry of the product onto the land."  *County of Santa Clara v. Atlantic Richfield Co.*,

5  137 Cal.App.4th 292, 315, 40 Cal.Rptr.3d 313 (2006).

6       Street is correct that the record lacks evidence to support trespass elements.  The record reveals

7  a sale of the Puritan Rescue 800 which Team voluntarily placed on the property.  Nothing indicates that

8  Street thrust its equipment onto the property without Team's consent.  Given that the Puritan Rescue 800

9  is not a trespasser, the trespass claim fails.  Team raises no meaningful opposition to revive the trespass

10  claim.

11                    **Equitable Indemnity**

12       The TAC's (tenth) equitable indemnity claim alleges that "Defendants are jointly liable" and

13  "obligated to defend, indemnify and hold harmless Team."

14       Street argues that "in the absence of Street's liability on any substantive ground, Team's

15  indemnity claim fails."  Team responds that its CERCLA and HSAA claims are valid to render its

16  equitable indemnity claim valid.

17       California Civil Code section 1432 addresses contribution among joint obligors and provides that

18  "a party to a joint, or joint and several obligation, who satisfies more than his share of the claim against

19  all, may require a proportionate contribution from all the parties joined with him."  Under California

20  Code of Civil Procedure section 875(c), "contribution may be enforced only after one tortfeasor has, by

21  payment, discharged the joint judgment or has paid more than his pro rata share thereof."

22       "California law permits a concurrent tortfeasor to obtain equitable indemnity *only* from another

23  concurrent tortfeasor."  *General Motors Corp. v. Doupnik*, 1 F.3d 862, 865 (9th Cir. 1993) (italics in

24  original).  "[T]here can be no indemnity without liability . . . [U]nless the prospective indemnitor and

25  indemnitee are jointly and severally liable to the plaintiff there is no basis of indemnity."  *Munoz v.*

26  *Davis*, 141 Cal.App.3d 420, 425, 190 Cal.Rptr. 400, 403 (1983).  "[A] right to indemnify exists only if

27  the injured party has a *legal cause of action* against both the indemnitor and the indemnitee." *Doupnik*,

28  1 F.3d at 866 (italics in original).  The indemnity "doctrine presupposes that 'each of two persons is

1   made responsible by law to an injured party.'" *New Hampshire Ins. Co. v. Sauer*, 83 Cal.App.3d 454,

2   459, 147 Cal.Rptr. 879, 882 (1978) (citations omitted).

3         In the absence of predicate liability, the equitable indemnity claim fails, especially given failure

4   to qualify Street as a concurrent tortfeasor.

5                                          **Declaratory Relief**

6         The (eleventh) declaratory relief claim seeks "judicial determination of Team's rights,

7   indemnification and contribution" and that Team is not liable for all costs to clean up and remediate the

8   property.

9         Street argues that the declaratory relief claim fails in the absence of an actual controversy in that

10  the "law awards no declaratory relief in absence of any viable substantive claim.." Team rests the

11  claim's viability on that of its CERCLA and HSAA claims.  Team responds that its CERCLA and

12  HSAA claims are valid to render its declaratory relief claim valid.

13        The Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201, 2202, provides in pertinent part:

14              In a case of actual controversy within its jurisdiction . . . any court of the United
                States, upon the filing of an appropriate pleading, may declare the rights and other legal
15              relations of any interested party seeking such declaration, whether or not further relief
                is or could be sought.  Any such declaration shall have the force and effect of a final
16              judgment or decree and shall be reviewable as such.

17  28 U.S.C. §2201(a).

18        The DJA's operation "is procedural only."  *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*,

19  300 U.S. 227, 240, 57 S.Ct. 461, 463 (1937).  "A declaratory judgment is not a theory of recovery."

20  *Commercial Union Ins. Co. v. Walbrook Ins. Co., Ltd.*, 41 F.3d 764, 775 (1st Cir. 1994).  The DJA

21  "merely offers an *additional remedy* to litigants."  *Nat'l Union Fire Ins. Co. v. Karp*, 108 F.3d 17, 21

22  (2nd Cir. 1997).  A DJA action requires a district court to "inquire whether there is a case of actual

23  controversy within its jurisdiction."  *American States Ins. Co. v. Kearns*, 15 F.3d 142, 143-144 (9th Cir.

24  1994).

25        As to a controversy to invoke declaratory relief, the question is whether there is a "substantial

26  controversy, between parties having adverse legal rights, or sufficient immediacy and reality to warrant

27  the issuance of a declaratory judgment."  *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270,

28  273, 61 S.Ct. 510, 512 (1941).  The United States Supreme Court has further explained:

                                                    26

A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. . . . The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. . . . It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Haworth*, 300 U.S. at 240-241, 57 S.Ct. at 464 (citations omitted).

The declaratory relief claim falls with the demise of the CERCLA, HSAA and other claims and the absence of a cognizable justiciable controversy.

## **CONCLUSION AND ORDER**

For the reasons discussed above, this Court:

1.      GRANTS Street summary judgment; and

2.      DIRECTS the clerk to enter judgment in favor of defendant R.R. Street & Co., Inc. and against plaintiff Team Enterprises, LLC in that there is no just reason to delay to enter such judgment given Team's claims against Street and Street's alleged liability is clear and distinct from claims against and liability of other defendants. *See* F.R.Civ.P. 54(b).

IT IS SO ORDERED.

**Dated:    August 9, 2010**                    /s/ Lawrence J. O'Neill
                                          UNITED STATES DISTRICT JUDGE